UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DAVID B. TURNER,  )<br>)<br>Plaintiff,  )<br>)<br>vs.  )<br>)<br>NATIONAL CITY BANK/PNC,  )<br>)<br>Defendant.  )<br>) | Cause No. 1:10-cv-375-WTL-DML |

## ENTRY ON MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's Motion for Summary Judgment (dkt. no. 51). The motion is fully briefed and the Court, being duly advised, now **GRANTS** the Defendant's motion for the reasons set forth below.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court

is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND

The facts of record viewed in the light most favorable to Plaintiff David Turner are as follow.

Turner was hired by Defendant National City Bank/PNC ("the Bank") as a full-time customer service representative/teller on October 27, 2008. Turner worked at the Bank's Greenwood, Indiana branch.

During his first week at the Bank, other Bank employees said the following to Turner:

(1) "What do black people eat?" (This was asked by office manager Kelly Hinz and co-worker Christina Jackson during a discussion of an upcoming pot luck meal at the Bank.)

(2) "Do you have any kids or baby mamas? . . . . [D]on't most black guys have like three to four baby mamas?" (This was asked by Jackson.[1])

(3) "I just don't see you fitting in here at the branch." (This comment was made by co-worker Debbie McGrady in conjunction with providing Turner with information about a job opportunity at the FAA where her husband was employed, a job she said would be a "perfect fit" for Turner.)

Turner Deposition at 79-82.

At the conclusion of Turner's first week at the Bank (around November 3, 2008), he met

---

[1]In the "Summary of the Facts" section of his supplemental brief, Turner asserts that this statement was made by Hinz; however, his deposition clearly indicates that it was made by Jackson.

with Branch Manager Jason Benson. Turner testified that he told Benson the following during the meeting:

> I think that I'm not fitting in here, I think that it's a possibility we may need to consider a possible transfer. I told him that I feel uncomfortable, stating that I think it's because of my race but I can not rule it out. And I specifically told him exactly this.

*Id*. at 86. Turner did not relate to Benson what specific comments had been made and by whom; however, he "state[d] that I believe it is racist and I did let him know that I believe that racism is rearing it's [sic] head." *Id*. In response, Benson told Turner: "'You are up there with a bunch of females. You have to give them time to warm up to you.'" *Id*. at 88. Turner expressed to Benson "maybe five times before December 16th that I feel I was being mistreated"; he "never went into examples or details as far as what the quote unquote is, but I told [him] that I feel by me being African American I don't believe that anyone necessarily likes or respects me." *Id.* at 154.

In November, although he had been working at the Bank for less than one month, Turner asked to take off the day after Thanksgiving. Turner's request was denied because two more senior employees had already requested to be off that day. In denying his request, Office Manager Kelly Hinz remarked to Turner: "It looks like you won't be going home for your mama's chitlings and chicken." *Id. at* 243. Turner subsequently requested December 26, 2008, off so he could spend Christmas with his family in Cleveland. Turner spoke with Benson and Hinz and "they told me that I – they looked at the book and said no one currently has that day requested, but we know the majority of the time Michelle will probably take it off." *Id*. at 100. Although neither Benson nor Hinz guaranteed that Turner would receive that day off, they permitted him to request it. Ultimately, Turner's request to take December 26th off was not

3

approved; instead, he called in sick.

On December 1, 2008, Benson sent Turner the following email: "Are you not taking full hour lunches? Your time card is only showing 50 minute lunches. Please keep it at an hour and try to document your time on a daily basis." If an employee did not take a full hour for lunch each day, he would incur overtime by the end of the workweek.

Sometime during this time period, as Turner was returning from his lunch break one day Hinz gave him a "high five" and said "What's up my nigger?" *Id*. at 153. Turner told Hinz that that "wasn't cool" and it did not happen again. Turner did not report the incident when it occurred.

In mid-December 2008, it was determined that $10,000 was missing from the Bank's backup vault. The Bank opened an investigation and two individuals from the Loss Avoidance and Investigations Department ("LAI") visited the Bank to conduct employee interviews. In preparation for the interviews, the LAI investigators reviewed employee personnel files and contacted former employers. Their research revealed discrepancies in Turner's employment application. The LAI investigators asked Turner about these discrepancies when they interviewed him on the afternoon of December 16, 2008. Turner also spoke about his personal life and his side businesses during the interview. Turner was interviewed for about two hours, longer than the other employees had been questioned. During the course of the interview, one of the LAI investigators asked Turner if he "knew where he was" and then remarked: "'[Y]ou are in Johnson County . . . [and] I just want to let you know that . . . the white folks here don't play that.'" *Id*. at 131. Turner responded: "[W]ell, yeah, I heard that from someone, someone told me that Greenwood was not a place for black folks." *Id.* at 135.

4

At the conclusion of Turner's interview, the investigators told him that the police were on their way to the branch and he should remain in the interview room. After about 25-30 minutes, Turner grew tired of waiting, left the room, and "went on a somewhat rampage" because he felt he had been "targeted," "mistreated," and that the investigators' conduct was "unjust, unfair." *Id*. at 134. During his "rampage" Turner stated in a loud voice that his civil rights had been violated. When one of the investigators asked if she should call the police, Turner stated: "'Black man talking. Black man talking. Better call for assistance.'" *Id*. at 137.

On the next day that Turner was scheduled to work (either December 18th or 19th, the record is not clear), Turner met with Benson and with the Bank's District Manager, Sharissa Ulrey. During that meeting, Turner's inappropriate behavior on December 16 was discussed. Turner responded by telling them that he believed he had been mistreated since he started at the Bank; Ulrey then asked him why he felt that way. Turner testified as follows regarding the conversation that ensued:

> The first week I got here, you know, I have been asked what type of food do black people eat, do I have baby mamas. I told them that Kelly Hinz called me a nigger. I told them. They responded, they said, well, explain that one to me. I said, well, when I was coming back from lunch she high-fived me and said, "What's up my nigger?" I told them that. When I was telling them the example, that's when they took it to a point to me it feel like they took it more serious. I have been expressing my feelings to Jason not once, not twice, but maybe five times before December 16th that I feel I was being mistreated. I never went into examples or details as far as what the quote unquote is, but I told them that I feel by me being African American I don't believe that anyone necessarily likes me or respects me. He replied . . . once I informed him of all of the examples of the way I was treated, he replied, "Well, we are going to call HR. You should receive a call from them, you know, in one or two days or so."

*Id*. at 153‒54.

When no one from human resources contacted him, Turner contacted them, either shortly

5

before or shortly after Christmas. In early January 2009, Senior Human Resources Consultant Erica Hudson contacted Turner.

Around the same time, on Friday, January 2nd, Turner was scheduled to work the drive-thru window at the Bank. Turner felt that it was unfair that he had to work the drive-thru because he had already worked it once that week. Turner convinced one of his co-workers to take his drive-thru shift; however, Kelly Hinz overheard this exchange, intervened, and ordered Turner do the drive-thru shift. Ultimately, Jason Benson became involved and told Turner that if he would not work the drive-thru then he should go home for the day. Turner then left the Bank. He was subsequently given a "One Time Warning" for insubordination.

Four days later, on January 6, 2009, Turner was processing night deposit bags. When a teller took a night deposit bag for processing, the teller was to complete a form known as the Night Depository Record of Contents form ("the Form"). The teller who handled and processed each night deposit bag was to initial the Form. At the end of the day, when all of the night deposit bags were processed, whoever closed out the Form then signed it and filed it. On January 6th, Benson gave Turner a "Feedback and Coaching Action Plan" related to his handling of the night deposit bags. Benson wrote: "The night drop record needs to be completed correctly to ensure that proper audit procedures are being followed. When you are taking bags to process you must put your initials down that you have taken that bag. When you have completed those bags, initial." *Id*. at 185. Turner acknowledged that he had failed to initial the Form. Two white tellers did not receive feedback or coaching when they failed to sign and file the Form after all of the night deposit bags were processed.

From January 16 through February 4, Senior Human Resources Consultant Erica Hudson

6

interviewed the LAI investigators and the staff at the Bank's Greenwood branch about Turner's allegations. Only one Bank employee reported hearing discriminatory comments directed toward Turner. Sometime in mid-January, while the human resources investigation was ongoing, Turner participated in a conference call with Hudson, Benson, and Ulrey. Hudson spoke to Turner about the "posting process" he could use to request a transfer to an open position in another Bank branch. They also informed him that there was an open position in a branch with an African-American Branch Manger. Although Turner understood the posting process, he ultimately decided not to post for any open positions because he did not want any future manager to see certain items in his personnel file, including the "One Time Warning" and the "Feedback and Coaching Action Plan."

On January 29, 2009, one of Turner's co-workers asked him why he had not checked the Bank's security cameras. Based upon his co-worker's tone of voice, Turner responded "no comment" and walked away. As Turner describes it, the co-worker then followed him to his work station at the drive-thru window, "got in my face, put her hands in my face, started tapping my forehead and saying, 'How dare you put me in the investigation. I did nothing wrong to you. How dare you do this.'" *Id.* at 200. Turner felt threatened by the co-worker's actions and called the police. Although the police responded to Turner's call, they did not make any arrests.

On February 18, 2009, Turner resigned from the Bank by hand-delivering a letter to Office Manager Kelly Hinz.

## III. DISCUSSION

In his amended complaint, Turner asserts the following claims: (1) hostile work environment; (2) disparate treatment; (3) retaliation; and (4) constructive discharge. The Bank moves for summary judgment on all of Turner's claims, each of which will be addressed, in turn, below.

### A. Harassment/Hostile Work Environment

Turner's hostile environment claim "falls under the general rubric of harassment at the workplace, which can amount to prohibited discrimination in terms and conditions of employment." *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). In order for Turner to survive summary judgment, the record must "contain sufficient evidence to create a material issue of fact as to four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) race must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011).

> We do not focus on discrete acts of individual employees when evaluating a hostile work environment claim, but must consider the entire context of the workplace. To support a hostile work environment claim, the plaintiff need not show that the complained-of conduct was explicitly racial, but must show it had a racial character or purpose. Further, the plaintiff must show that the alleged harassment was both subjectively and objectively so severe or pervasive that it altered the conditions of his employment. In other words, the environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. We will not find a hostile work environment for mere offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating.

*Id.* (citations and internal quotation marks omitted).

In this case, Turner alleges the following questions and comments created a hostile work

environment:

- "What do black people eat?"

- "Do you have any kids or baby mamas? . . . . [D]on't most black guys have like three to four baby mamas?"

- "I just don't see you fitting in here at the branch."

- "It looks like you won't be going home for your mama's chitlings and chicken."

- "What's up, my nigger?"

- "'[Y]ou are in Johnson County . . . [and] I just want to let you know that . . . the white folks here don't play that.'"[2]

As a matter of law, these comments are too few to constitute "pervasive" racial harassment. And while the comments are certainly inappropriate and suggestive of ignorance and immaturity on the part of the speakers, they also are not sufficient to satisfy the alternative requirement of being "severe." *Cf. Ford v. Minteq Shapes & Servs., Inc.*, 587 F.3d 845 (7th Cir. 2009) (environment not "severe" where plaintiff was repeatedly referred to as "black African-American" and "black man," called "gorilla" on one occasion, and told that he did not need to worry about losing his job because the company "wanted to appear integrated"); *Thompson v. Memorial Hosp. of Carbondale*, 625 F.3d 394 (7th Cir. 2010) (environment not "severe" where plaintiff was told that he "could not do what others could do because he was black" by one co-worker and told by another that "she was not sure what her neighbors would think if she invited a black person to

---

[2]Turner also points to the fact that the LAI investigators told him at the conclusion of his interview that the police were coming to the Bank as an additional hostile act. However, there is no support for the proposition that that statement "had a racial character or purpose" such that it constituted *racial* harassment.

her home").

Turner compares the treatment he received to the conduct in *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908 (7th Cir. 2010), and *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668 (7th Cir. 1993), implying that those cases stand for the proposition that the use of the word "nigger" by a superior "in addition to other comments and statements about the employee's race" will always constitute a hostile environment. It is true the court noted in both cases that "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." 12 F.3d at 675 (internal citations and quotation marks omitted). However, in this case Turner does not suggest that Hinz used the word to express racial hostility; rather, it is clear from the context that she used it as part of what was intended to be a friendly greeting. When Turner told her that her use of the word was "uncool," she did not use it again. While it is unfortunate that Turner was placed in the position of educating his co-workers[3] regarding acceptable behavior, Title VII protects employees from work environments that are hostile, not from co-workers who are ridiculously ignorant of what is and is not offensive.

As a matter of law, the comments pointed to by Turner were neither severe nor pervasive enough to violate Title VII. Accordingly, the Bank is entitled to summary judgment on Turner's hostile work environment claim.

---

[3]The terms "co-workers" is used here in the generic sense to mean those one works with; the Court recognizes that Hinz was a supervisor.

## B. Constructive Discharge

"To prevail on a claim for constructive discharge, a plaintiff must prove both that the defendant engaged in 'harassing behavior sufficiently severe or pervasive to alter the conditions of his employment,' and that 'the abusive working environment became so intolerable that [his] resignation qualified as a fitting response.'" *Witte v. Wisconsin Dept. of Corrections*, 434 F.3d 1031, 1035 (7th Cir. 2006) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 133-34 (2004)). "Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case. . . . Working conditions for constructive discharge must be even more egregious than those that would support a finding of a hostile work environment; absent extraordinary circumstances, an employee is expected to remain employed while seeking redress." *Id.* (internal quotations and citations omitted).

In this case, the incidents discussed above were not severe or pervasive enough to constitute a hostile work environment and therefore they also cannot support a constructive discharge claim. In addition to the comments set forth above, Turner notes that he was "threatened with prosecution for missing money that he did not have control over, and then subsequently was aggressively approached by [a] female [coworker] who put her finger in his face and tapped him on the head" and argues that "[t]he issue as to whether or not Turner reasonably perceived the incidents as threatening is not an undisputed issue of fact." Turner Brief at 8. The Bank argues that Turner's allegations fall short of supporting his constructive discharge claim because he was not threatened with serious bodily harm and because he returned to work after the finger tapping incident, thus demonstrating that he was not fearful for his safety. The Court agrees that the finger tapping incident described by Turner–even when

11

considered in light of the other incidents about which he complains–was not so egregious that "a reasonable person would have felt compelled to resign" because of it. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 247 (2004). Indeed, the facts of this case are not as egregious as those in *Dunn v. Washington County Hosp.*, 429 F.3d 689 (7th Cir. 2005), in which the plaintiff quit after an incident in which her coworker–who previously had threatened her with "payback" for complaining that he had sexually harassed her–"pushed [her] against a cabinet . . . and, while he had her pinned, tapped her on the cheek with a closed fist." The court held in that case that "[o]ne threat of this kind does not meet the standard of constructive discharge"; neither does the incident at issue in this case. Accordingly, the Bank is entitled to summary judgment on Turner's constructive discharge claim.

### C. Disparate Treatment

Turner alleges that he was subjected to disparate treatment because of his race in several respects:

- being denied time off on the day after Thanksgiving and the day after Christmas
- not being permitted to trade drive-thru duty with another teller
- being instructed to take a full hour for lunch to avoid accruing overtime
- receiving written "feedback and coaching action plan" for failing to sign the night depository slip
- being questioned longer than white employees during the loss investigation

Title VII is violated by disparate treatment in the form of a "materially adverse employment action." *Nicols v. Southern Illinois Univ.-Edwardsville*, 510 F.3d 772, 779 (7th Cir. 2007).

> A materially adverse employment action is something more disruptive than a mere inconvenience or an alteration of job responsibilities. While adverse

12

employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit. Thus, for purposes of Title VII, we have articulated three general categories of actionable, materially adverse employment actions: (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Id.* (citations and internal quotation marks omitted). As the Bank correctly points out, none of the actions pointed to by Turner constitute a materially adverse employment action. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (providing laundry list of actions that are not "materially adverse employment actions) (citing *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir.2003) (assigning harder work assignments); *Grube v. Lau Indus.*, 257 F.3d 723, 728 (7th Cir.2001) (altering work hours, giving negative performance evaluations and unfair reprimands); *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir.2001) (giving oral and written reprimands); *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (refusing preferred vacation schedule)). Because Turner does not point to any materially adverse employment action taken against him by the Bank, the Bank is entitled to summary judgment on Turner's disparate treatment claim.

### D. Retaliation

Finally, the Bank argues that Turner's retaliation claim, like his disparate treatment claim, must fail because Turner has filed to demonstrate the he suffered an adverse employment

action. The Bank is correct that a claim for retaliation requires an adverse employment action. *See Griffin*, 356 F.3d at 829. Turner does not address this issue in his brief; indeed, Turner's only mention of his retaliation claim in his brief is as follows:

> Turner has also alleged that after he filed his discrimination claim with the Equal Employment Opportunity Commission (EEOC), that his treatment by his co-workers worsened. The Bank conversely insinuates that after an internal investigation was undertaken concerning Turner's allegations of discrimination, that the comments ceased and there were no further incidents at the Bank. However, the Bank's own evidence relied on in its Memorandum in Support of Summary Judgment corroborates that the atmosphere at the branch had actually worsened and become increasingly hostile. Turner should be permitted to move forward with his retaliation claim to show that the worsening environment at the Bank was directly related to his filing the claim with the EEOC.

Turner Brief at 8. With one exception, all of the incidents alleged by Turner are addressed above in the Court's discussion of his disparate treatment claim; they do not constitute adverse employment actions in that context and do not in the retaliation contest either.

The one exception is the incident that occurred on January 29, 2009, between Turner and one of his co-workers who apparently was upset that she was included in the Bank's investigation of Turner's discrimination allegation. This incident cannot support Turner's disparate treatment claim because there is no indication that it was based upon his race; rather, it was motivated by his claim of discrimination. *Cf. Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 809 (7th Cir. 2001). And while *Berry* suggests that hostile acts by co-workers in retaliation for making a discrimination claim can, under certain circumstances, constitute retaliation that violates Title VII, Turner makes no attempt to demonstrate that such circumstances are present here. Accordingly, the Bank is entitled to summary judgment on Turner's retaliation claim.

## IV. CONCLUSION

For the reasons set forth above, the Defendant's Motion for Summary Judgment is

**GRANTED** in its entirety.

  SO ORDERED: 12/08/2011

                  _____
                  Hon. William T. Lawrence, Judge
                  United States District Court
                  Southern District of Indiana

Copies to all counsel of record via electronic notification.